UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Katherine Gatsas,
    Plaintiff

    v.                                   Civil No. 05-cv-315-SM
                                            Opinion No. 2006 DNH 127
Manchester School District
also known as School
Administrative Unit No. 37,
    Defendant

## O R D E R

Katherine Gatsas brings this discrimination suit against Manchester School District, also known as School Administrative Unit No. 37 ("the District"), claiming that she was subjected to disparate treatment based on gender, in violation of 42 U.S.C. 2000e-2(a) (Count I) and a related state statute (Count II). She also asserts claims of retaliation (Count III) and wrongful or retaliatory discharge (Count IV).

Defendant moves for summary judgment. For the reasons set forth below, defendant's motion for summary judgment is denied.

### STANDARD OF REVIEW

Summary judgment is appropriate when the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

FED. R. CIV. P. 56(C).  In considering a motion for summary judgment, the court must view the record "in the light most hospitable" to the nonmoving party.  Euromodas, Inc. v. Zanella, Ltd., 368 F.3d 11, 17 (1st Cir. 2004) (citing Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  An issue is "'genuine' if the parties' positions on the issue are supported by conflicting evidence."  Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 200 (1st Cir. 1996) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).  An issue is "'material' if it potentially affects the outcome of the suit."  Id. at 199–200.

In support of its summary judgment motion, the moving party must "identify[] those portions of [the record] which . . . demonstrate the absence of a genuine issue of a material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party successfully demonstrates the lack of a genuine issue of material fact, "the burden shifts to the nonmoving party . . . to demonstrate that a trier of fact reasonably could find in [its] favor."  DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citing Celotex, 477 U.S. at 322–25).  Once the burden shifts, the nonmoving party "may not rest upon mere allegation[s]

or denials of his [or her] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.

## BACKGROUND

The facts, set forth in the light most favorable to Gatsas are as follows.  Gatsas has worked for the District since 1998, starting out as a long-term substitute teacher and later becoming a member of the full-time staff, teaching primarily sixth grade science.  (Def.'s Mot. Summ. J., Ex. A (Gatsas Employment R.)) Gatsas earned a bachelor's degree in 1978 and a master of education degree in 1990, both from Notre Dame College in Manchester, New Hampshire.  (Gatsas Employment R.)  Gatsas also holds elementary education and principal certifications, (Gatsas Employment R.), as well as a general special education endorsement, from the New Hampshire Department of Education. (Def.'s Mot. Summ. J., Ex. Q.)

In early 2003, the District posted a job vacancy announcement seeking an interim assistant principal for Hillside Middle School ("Hillside" or "the School"), the school at which Gatsas taught.  (Def.'s Mot. Summ. J., Ex. B (Job Posting.))  The announcement disclosed that the job qualifications included a

masters degree in educational administration "or equivalent required for certification," New Hampshire certification as a principal, a statement of eligibility, or enrollment in an accredited certification program, and experience as a certified teacher.  (Job Posting.)  The posting also indicated that the successful candidate would be a "visionary" as well as a "collaborator who utilizes the strengths of staff, students, parents, and community in creating a quality learning environment."  (Job Posting.)  Notwithstanding the qualifications described in the job posting, "when the District considers candidates for interim positions, [it is] often more flexible with respect to hiring criteria."  (Def.'s Mot. Summ. J., Ex. C (Bass Aff.) ¶ 4.)

Six people, three men and three women, including Gatsas, applied for the position.  (Writ ¶ 12.)  Of the six, four were already employed at Hillside in various other capacities.  (Def.'s Mot. Summ. J., Ex. D (Donohue Aff.) ¶ 4.  Each candidate was interviewed by Stephen Donohue, the principal of the School, and Joseph Ferrisi, the assistant principal, who selected two finalists, William Dupere and Stephen Harrises, for consideration by a final selection committee.  (Donohue Aff. ¶ 8.)  After the screening committee reviewed the candidates, the superintendent

and assistant superintendent made the ultimate decision to
appoint Mr. Dupere, then a guidance counselor at Hillside, to
fill the interim assistant principal vacancy.  (Writ ¶ 12.)

Following Dupere's appointment to the interim position,
Gatsas's teaching assistant at the time, Martha Folopoulos, had a
casual conversation with Hillside assistant principal Joseph
Ferrisi during which he agreed with a comment made by Folopoulos
to the effect that the principal "would have never hired somebody
like Kathie [Gatsas] because she's a strong . . . woman."  (Pl.'s
Mot. Opp. Summ. J., Ex. 18 (Folopoulos Depo.) 11–12.)

Believing that she had been passed over for the interim
position because of her gender, and to express her
dissatisfaction with the District's hiring decision, Gatsas
placed advertisements in several local newspapers criticizing the
District and Principal Donohue for the decision, and alleging
that Dupere was unqualified for the job and that the District
discriminates on the basis of gender.  (Def's. Mot. Summ. J.,
Ex. G.)

On or about April 14, 2003, Gatsas filed charges with both
the New Hampshire Commission for Civil Rights and the federal

Equal Employment Opportunity Commission ("EEOC"), alleging gender
discrimination.  (Writ ¶ 7.)

At the end of the 2002-2003 school year, after placing the
newspaper advertisements and filing discrimination complaints,
Gatsas received notification that her teaching assignment had
been changed for the following school year.  (Writ ¶ 13.)
Instead of teaching sixth grade science, as she had in the past,
she was slated to teach seventh grade language arts, and was to
be relocated to a different classroom, Room G25, which was
located in the school's basement and was generally considered to
be undesirable.  (Writ ¶ 14.)  In August, just prior to the start
of the 2003-2004 school year, Gatsas raised concerns about her
new assignment with her union representative.  As a result, her
reassignment was rescinded.  (Writ ¶ 18.)  Gatsas never taught a
seventh grade class nor did she ever teach in Room G25.  (Def.'s
Mot. Summ. J., Ex. K (Gatsas Depo.) 66.)  On or about August 13,
2003, Gatsas amended her complaint with the EEOC to include a
charge of retaliation, presumably related to the reassignment.
(Writ ¶ 7.)

Gatsas also sought other assignments within the District,
including two long-term substitute teaching assignments, but was

6

unsuccessful.  (Writ ¶ 21.)  Upon her return to the class in
September 2003, Gatsas experienced what she characterized as
"rude and hostile" behavior by members of the school
administration, which included "refusing to speak to her, failure
to provide her with requested teaching supplies, and jostling her
in the hallways of the school."  (Writ ¶ 19.)  In November 2003
Gatsas began using her allotted sick time, subsequently providing
"a letter from her psychiatrist indicating that she felt unable
to work."[1]  (Def.'s Mem. Summ. J., Ex. L.)  Gatsas has been "out
of work" since December 2003.  (Writ ¶ 23.)

On January 5, 2005, Gatsas notified the District that she
was ready to return to work, and that she would prefer to be
placed somewhere other than Hillside.  (Def.'s Mot. Summ J.,
Ex. O.)  A letter from Gatsas's psychologist indicated that she
was interested in pursuing employment as an "Out of District
Placement Monitor," a position for which the District agreed to

---

[1] There is some dispute as to the status of Gatsas's
employment.  In her complaint, Gatsas characterizes her departure
as "an unpaid medical leave of absence" as a result of workplace
stress.  (Writ ¶ 22.)  In its Memorandum of Law in Support of
Motion for Summary Judgment, the District notes that "although
[Gatsas] has never been terminated, she has never been granted an
approved leave of absence," (Def.'s Mot. Summ. J., Ex. N.),
because "the District requested that [Gatsas] complete FMLA forms
in order to approve her leave status, [but] she never submitted
those forms."  (Def.'s Mot. Summ. J., Ex. N)

interview Gatsas.  (Def.'s Mot. Summ. J., Ex. P.)  But, because she lacked reliable transportation, a necessity, Gatsas was unable to pursue the position.  (Gatsas Depo. 130-31.)

On or about May 11, 2005, the EEOC issued a Notice of Right to Sue.  (Writ ¶ 8.)  Because she believed she had been denied the interim assistant principal position, and suffered retaliatory treatment because of her accusations of gender discrimination, Gatsas brought this four-count complaint against the District for violating her rights under 42 U.S.C. 2000e-2(a) and related state statutes.

## DISCUSSION

Defendant moves for summary judgment on all four counts. With respect to Counts I and II, the District says Gatsas has failed to demonstrate that its proffered nondiscriminatory reason for its decision to hire someone else for the interim position was a pretext for unlawful gender discrimination.  Regarding Count III, the District contends that Gatsas has failed to establish that she suffered an adverse employment action, or alternatively, that she cannot demonstrate any causal connection between her protected activity and the allegedly retaliatory conduct.  Finally, regarding Count IV, defendant asserts that

state law precludes a common law wrongful termination action
where a statutory cause of action is available to redress the
same complaint, as it is here.

I.   Disparate Treatment – Title VII (Count I)

"The operative provision of Title VII makes it unlawful to
'discriminate against any individual with respect to his [or her]
compensation, terms, conditions, or privileges of employment,
because of such individual's . . . [race, color, religion, sex,
or national origin].'" Noviello v. City of Boston, 398 F.3d 76,
89 (1st Cir. 2005) (quoting 42 U.S.C. § 2000e-2(a)(1)).  "[I]n a
disparate treatment case, '[t]he central focus of the inquiry
. . . is always whether the employer is treating some people less
favorably than others because of their race, color, religion,
sex, or national origin.'"  Thomas v. Digital Equip. Corp., 880
F.2d 1486, 1490 (1st Cir. 1989) (quoting Furnco Constr. Corp. v.
Waters, 438 U.S. 567, 577 (1978)) (internal quotation marks
omitted).

The parties dispute which analytical framework better fits
this case.  Gatsas argues that because she has put forth direct
evidence of discrimination, this case should be considered a
mixed-motive case, as described in Price Waterhouse v. Hopkins,

490 U.S. 228 (1989).  The District counters that Gatsas has

proffered only circumstantial evidence of discrimination, so the

familiar burden-shifting framework set out in McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973), is more appropriate.

Generally the Price Waterhouse mixed-motives framework is

reserved for cases in which a plaintiff puts forth direct

evidence of discrimination.  Patten v. Wal-Mart Stores E., Inc.,

300 F.3d 21, 25 (1st Cir. 2002).[2]  Direct evidence is that which

---

[2] There remains some uncertainty as to whether the
distinction between direct and circumstantial evidence still
exists in light of the Supreme Court's recent decision in Desert
Palace, Inc. v. Costa, 539 U.S. 90 (2003).  Under Desert Palace,
a plaintiff no longer needs direct evidence of discrimination to
trigger mixed-motive analysis, but instead must simply "present
sufficient evidence for a reasonable jury to conclude, by a
preponderance of the evidence, that race, color, religion, sex,
or national origin was a motivating factor for any employment
practice."  Id. at 101 (quotation marks omitted).  Whether this
new evidentiary standard applies at the summary judgment stage
remains an open question, however.  LEX K. LARSON, LARSON'S EMPLOYMENT
DISCRIMINATION § 8.09 (2d ed. 1994).  Although the Court of Appeals
for the First Circuit has yet to address the issue, the Eighth
Circuit recently explained that Desert Palace simply indicates

> that a plaintiff bringing an employment discrimination
> claim may succeed in resisting a motion for summary
> judgment where the evidence, direct or circumstantial,
> establishes a genuine issue of fact regarding an
> unlawful motivation for the adverse employment action
> . . . even though the plaintiff may not be able to
> create genuine doubt as to the truthfulness of a
> different, yet lawful, motivation.

Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1018 (8th Cir.
2005).

"consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000). In such cases, "plaintiff's burden is tempered so that [he or] she need prove only that the discriminatory action was a motivating factor in an adverse employment decision." Patten, 300 F.3d at 25. Upon proving that the employment decision was based, at least in part, upon discriminatory animus, "the employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff." Desert Palace, 539 U.S. at 94. "In order to avail itself of the affirmative defense, the employer must 'demonstrate that [it] would have taken the same action in the absence of the impermissible motivating factor.'" Id. at 94-95 (quoting 42 U.S.C. § 2000e-5(g)(2)(B) (replaced text in original)).

In cases where only circumstantial evidence of discrimination is presented, the McDonnell-Douglas analysis is appropriate.[3] Under that test,

---

[3] The Supreme Court's decision in Desert Palace has also given rise to uncertainty as to whether the McDonnell-Douglas burden-shifting framework remains valid. Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 (1st Cir. 2003). The First Circuit noted recently "that in Raytheon Co. v. Hernandez, 540

a plaintiff must establish a prima facie case, which in
turn gives rise to an inference of discrimination.  <u>See</u>
<u>Dichner v. Liberty Travel</u>, 141 F.3d 24, 29-30 (1st Cir.
1998).  The employer then must state a legitimate,
nondiscriminatory reason for its decision.  <u>See</u> <u>Zapata-</u>
<u>Matos v. Reckitt & Colman, Inc.</u>, 277 F.3d 40, 44 (1st
Cir. 2002).  If the employer can state such a reason,
the inference of discrimination disappears and the
plaintiff is required to show that the employer's
stated reason is a pretext for discrimination.  <u>See id.</u>
at 45.

<u>Kosereis v. Rhode Island</u>, 331 F.3d 207, 212 (1st Cir. 2003).


In deciding which analytical framework better fits this
case, the court must consider whether Gatsas has put forth
sufficient evidence from which a reasonable jury could conclude
by a preponderance that the District's hiring decision was
motivated, in part, by discriminatory animus.


Gatsas argues that by agreeing to (and adopting)
Folopoulos's assertion that the District did not (or would not)
hire her because she was a "strong, aggressive woman," Ferrisi
effectively made a statement that reflected a discriminatory
animus bearing directly on the challenged decision.  The District
counters that Ferrisi's agreement referred not to the gender
aspect of Folopoulos's remark, but rather, the personality

U.S. 44 (2003), the Supreme Court used the McDonnell-Douglas
framework without commentary in a post-<u>Desert Palace</u> case."  <u>Id.</u>

aspect.  That is, that Donohue would not have hired anyone – male or female – who exhibited aggressive personality characteristics such as those attributed to Gatsas.

In considering whether particular remarks constitute direct evidence of gender discrimination, the court must exclude "'mere background noise' and 'stray remarks.'"  Patten, 300 F.3d at 25 (quoting Febres, 214 F.3d at 61).  Moreover, "'[a] statement that can plausibly be interpreted two different ways – one discriminatory and the other benign – does not directly reflect illegal animus . . .'"  Id. (quoting Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 583 (1st Cir. 1999)).  On the other hand, "[t]he mere fact that a fertile mind can conjure up some innocent explanation for such a comment does not undermine its standing as direct evidence."  Febres, 214 F.3d at 61.

Here, the District asserts that the Folopoulos remark, with which Ferrisi allegedly agreed, can be plausibly interpreted two different ways.  Although the discriminatory interpretation suggests that Gatsas was not given the job because she was an aggressive woman, the benign interpretation speaks only to the personality characteristic of assertiveness, rather than to her gender.  Facially, the distinction is a fine one, but the context

13

in which the comment was made, especially when considered in the
light most favorable to the plaintiff, is sufficient to permit a
reasonable jury to conclude that the District's decision not to
hire Gatsas was motivated, in part, by a discriminatory animus.

    In addition to that modest direct evidence of gender
discrimination, Gatsas points to the other factors — e.g., that a
male candidate was selected over a female candidate — as indirect
evidence of discriminatory animus.  She points out that not only
was a male hired, but that both male finalists for the position,
Dupere and Harrises, were unqualified for the position, because
they lacked the required educational credentials and state
certifications as described in the job posting.

    In brief, the job posting described the minimum
qualifications for the position as including a masters degree in
educational administration, state certification as a principal or
eligibility for such certification, as well as experience as a
certified teacher.   Harrises, one of the finalists, had
experience as a certified teacher, but lacked a masters degree or
principal certification, although he was enrolled in a masters
program in school administration which would lead to such
certification.  (Def.'s Mot. Summ. J., Ex. F (Donohue Aff. II)

14

¶ 2.)  Dupere held a masters degree and was certified by the
state as a guidance counselor, but apparently lacked
certification as a principal, and was not then eligible for
certification.  (Pl.'s Obj. Summ. J., Ex. 16.)  To cure this
obvious deficiency, Dupere agreed to, and in fact did,
subsequently enroll in a masters program in school administration
to obtain his principal's certification.  (Donohue Aff. II ¶ 2.)

The job posting plainly required that the successful
candidate hold a masters degree or its equivalent; it neither
stated nor implied that enrollment in a program leading to the
degree would be sufficient.  Moreover, Dupere's resume reveals
that while he had substantial experience as a guidance counselor,
he had little or no experience as a classroom teacher, as called
for in the job posting.  Gatsas, however, satisfied all of the
disclosed requirements.

The District seeks to justify its consideration of facially
unqualified candidates by explaining that it often relaxes its
standards when hiring for interim positions.  Such a practice
might well be prudent and necessary if, for example, few
qualified persons applied and the need to quickly fill the
position outweighed the need to fill it with a fully qualified

15

candidate.  On the other hand, circumstances might be that the only facially qualified applicants are so deficient in other qualities necessary to successful performance that a superior but facially unqualified person should be hired.

Here, defendant had at least one applicant, Gatsas, who met all of the qualifications described in the job posting.  On this concededly undeveloped record, there appears little explanation for relaxing the published criteria.  Coupled with the affirmation allegedly made by Ferrisi, the bare facts presented, taken in the light most favorable to Gatsas, could support a reasonable jury's determination that plaintiff was denied the interim position because of her gender.  Of course, there may well have been any number of other, valid, reasons to pass Gatsas by, notwithstanding her facial qualification.  But for purposes of this motion the facts must be taken in the light favoring Gatsas.

The District offers several nondiscriminatory reasons for its decision, including Gatsas's interview performance, her many absences, and her poor ability to fulfill the obligations of an administrative post, as well as the District's interest in minimizing disruption to students and staff by avoiding the

16

creation of a short-term class vacancy by filling the interim
position with a current teacher.  But these reasons are not
sufficient to avoid summary judgment, because plaintiff has put
forth sufficient evidence from which a jury could find by a
preponderance that the decision not to hire her was at least
partly based on an unlawful discriminatory motive.  In short, a
genuine dispute of material fact exists as to the District's
motivation in denying Gatsas the interim position.  Accordingly,
defendant is not entitled to judgment as a matter of law, and its
motion for summary judgment as to Count I is necessarily denied.


II.  Disparate Treatment - N.H. Rev. Stat. Ann. 354-A (Count II)

      Plaintiff alleges defendant's discriminatory conduct
violates New Hampshire Rev. Stat. Ann. ("RSA") 354-A.  That state
statutory claim fails, however, because the state law does not
provide for a private cause of action.  See Bergstrom v.
University of New Hampshire, 943 F. Supp. 130, 132 n.3 (D.N.H.
1996).  Accordingly, defendant's motion for summary judgment as
to Count II is granted.


III. Retaliation - Title VII (Count III)

      "[T]o establish a claim of retaliation, a plaintiff 'must
show that (I) she undertook protected conduct, (ii) she suffered

an adverse employment action, and (iii) the two were causally linked.'"  Carmona-Rivera v. Commonwealth of P.R., No. 05-2500, 2006 U.S. App. LEXIS 23257, *13 (1st Cir. September 12, 2006) (citing Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005)).

"[T]he anti-retaliation provision of Title VII 'is not limited to discriminatory actions that affect the terms and conditions of employment.'" Id. (citing Burlington N. & Santa Fe Ry. Co. v. White, 2006 U.S. LEXIS 4895 at *20 (June 22, 2006)). But rather, "'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (citing Burlington, 2006 U.S. LEXIS 4895 at *26) (quotation marks and citations omitted).  "The alleged retaliatory action must be material, producing a significant, not trivial, harm." Carmona-Rivera, 2006 U.S. App. LEXIS 23257 at *14.  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  Burlington, 2006 U.S. LEXIS 4895 at *27.

Here, it is undisputed that plaintiff engaged in protected conduct by filing complaints of gender discrimination with federal and state authorities.  At issue is whether plaintiff suffered materially adverse employment actions as a direct result of engaging in the protected conduct.

Plaintiff alleges that her announced reassignment to Room G25, an undesirable classroom located in the basement, and to teach seventh grade language arts instead of sixth grade science, constituted materially adverse actions that produced substantial harm.  But plaintiff never actually taught seventh grade language arts, and never taught in Room G25, since, after objecting through her union representatives, the new assignments were rescinded.

Even if plaintiff had actually switched subjects and taught in G25, it would be difficult to characterize such an assignment as being materially adverse.  The record indicates that teachers are frequently reassigned from year to year, and plaintiff's own employment history reveals that she had been reassigned several times in the past.  The classroom, though comparatively undesirable, was nevertheless an actively used classroom to which someone had to be assigned.  Further, aside from requiring

additional planning and preparation at the beginning of the academic year, there is no evidence that teaching seventh grade language arts is any more or less burdensome than teaching sixth grade science, or that Gatsas was unqualified to teach either. Thus, the announced reassignment is properly characterized as a minor annoyance which was promptly remedied by the administration upon learning of the objection.

Even if the reassignment was considered a materially adverse employment action, plaintiff has failed to demonstrate a causal connection between her filing of the complaints and the action taken by the District.  Although it is true that temporal proximity of the protected activity and subsequent wrongful conduct can be probative of a causal link, see Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001), here there is substantial evidence to suggest that the reassignment announcement was made consistently with standard practice, at the end of the school year, effective the following school year.  The mere fact that plaintiff filed her discrimination complaints at or about the time the District routinely announces teaching assignments for the following year is, alone, an insufficient basis upon which to conclude that her

reassignment was retaliatory in character or was otherwise the
product of her filing complaints of discrimination.

The other allegedly retaliatory action — being jostled in
the hallways, having Donohue visit her classroom frequently, the
threat of having certain furniture removed from the classroom,
and the lack of supplies — are all relatively trivial
vicissitudes of work life that the Burlington court sought to
omit from retaliation claims.  2006 U.S. LEXIS 4895 at *27-28.
In the parlance of Burlington, plaintiff's decision to report
discriminatory behavior cannot immunize her from petty slights
and minor annoyances that come with working at a large public
middle school.

As noted in Burlington, the standard for determining whether
a particular action is materially adverse is an objective one,
that is, the question is whether a reasonable person would find
the conduct to be materially adverse.  2006 U.S. LEXIS 4895 at
*28.  While there is no doubt that plaintiff found some of the
allegedly retaliatory behavior to be unpleasant and offensive, no
reasonable jury could find, based on the evidence proffered by
plaintiff, that the conduct she experienced was so materially
adverse so as to constitute retaliation as comprehended by Title

VII.  Accordingly, defendant is entitled to summary judgment on this claim, and its motion for summary judgment as to Count III is therefore granted.

IV.  Wrongful Discharge (Count IV)

Plaintiff argues that she has been effectively discharged as a teacher with the District as a result of her reporting the alleged gender discrimination.  Defendant counters that plaintiff is barred from bringing a common law wrongful discharge claim because a statutory cause of action is available to her, based on the same facts.  Defendant is correct.

"In <u>Wenners v. Great State Beverages, Inc.</u>, 140 N.H. 100 (1995), the plaintiff relied on a section of the Bankruptcy Code" in support of its wrongful discharge claim.  <u>Smith v. F.W. Morse & Co.</u>, 76 F.3d 413, 429 (1st Cir. 1996).  In that case,

> [t]he court held that "while a plaintiff may not pursue a common law remedy where the legislature intended to replace it with a statutory cause of action," a wrongful discharge action could proceed if the relevant statutory provision did not provide a private cause of action for its violation.

<u>Id.</u> (quoting <u>Wenners</u>, 140 N.H. at 103).

Further, "Title VII not only codifies the public policy against gender-based discrimination but also creates a private right of action to remedy violations of that policy and limns a mature procedure for pursuing such an action." <u>Id.</u> at 430. Here, plaintiff has brought two claims under Title VII, one for disparate treatment and one for retaliation, each claim arising out of the same facts as the wrongful discharge claim.  Thus, "[u]nder <u>Wenners</u>, the existence of such a remedy precludes [plaintiff], in the circumstances of this case, from asserting a common law claim for wrongful discharge." <u>Id.</u>  Accordingly, defendant is entitled to judgment as a matter of law and its motion for summary judgment is therefore granted as to Count IV.

## CONCLUSION

For the reasons given, defendant's motion for summary judgment (document no. 17) is granted in part and denied in part. Specifically, judgment shall be entered in defendant's favor on Counts II, III, and IV.  Otherwise the motion for summary judgment is denied.

**SO ORDERED.**

Steven J. McAuliffe
Chief Judge

November 7, 2006

cc:  Leslie H. Johnson, Esq.
     Kathleen C. Peahl, Esq.